Case 12-15-56, 15-58, Latin Americans for Social and Economic Development et al. v. Federal Highway Administration et al. Argument not to receive an appellant is presided by Mr. Hume, Mr. Garcia, for the appellants. D.I.B.C. has two main grounds for seeking reversal of the lower court, broadly speaking. First, and principally, we seek reversal because the district court should have set aside and invalidated the record of decision, the ROD, of the Federal Highway Administration as inconsistent with the National Environmental Policy Act, NEPA, and the Administrative Procedure Act, the APA. Second, however, we do also argue that even if the court does not reverse and remand to the agency, the court should reverse the district court for denying our motions to supplement the record or to strike the record because of its deficiencies. I intend to spend most of my time on the first point, Your Honors, but I wanted to recognize the second because there are portions of my argument which may touch upon some of the excluded documents that we think confirm and go to the heart of the flaws in this process. Moving to the NEPA and APA arguments, Your Honors. NEPA requires a fully informed and well-considered decision based on information that is given to the public and the decision makers. With that overall goal, which has been repeated in many courts including the Supreme Court, it requires a series of specific things including, number one, that the purpose of the proposed project be clearly stated and explained. Number two, that an environmental impact statement be conducted with thorough information and presented to the public and decision makers before a decision is made and not used as a justification for a decision that has already been made. Third, the NEPA regulations say that the heart of that environmental impact statement is the consideration of alternatives, what other actions could potentially fulfill the general goal and what would their environmental impacts be. That is the heart of the EIS and the NEPA regulations 1500.14 say that the agency must consider, quote, all reasonable alternatives. Which reasonable alternative didn't they consider? Judge Dowd, they did not consider the reasonable alternative of a privately owned and constructed new span to the existing Ambassador Bridge, which was obviously reasonable and the most reasonable alternative because it had ranked number one in its impact on protecting the natural environment, number one on its impact on the local community and neighborhoods, number one on its consistency with local planning. That can be found in the record at DRIC-1938. No one disputes that and yet it was eliminated from consideration. Your Honors, these requirements of NEPA, which also I would go on, require consideration of a no action alternative. What would happen if the government does nothing but take into account what others are predicted are likely to do? And fifth, NEPA requires that the information presented be of high quality and be a scientific analysis of the actual data. The agency in this case violated all of those NEPA requirements. Stated briefly, it made an undisclosed and unexplained to the public decision to commit itself that the new crossing over the Detroit River had to be publicly owned and could not be a privately owned twin span to the Ambassador Bridge, even though the Ambassador Bridge has been privately owned and operated with great success for over 80 years and is well maintained and is subject to oversight and rate control but is privately owned. In addition, they then later, instead of saying that the reason they eliminated the Ambassador Bridge twin span was because of their commitment to public ownership, they issued a decision document saying that they were deferring to Canadian objections to the environmental impacts of the twin span. But there is nothing in the record showing that Canadian analysis and nothing in the record showing that FHWA did any independent analysis. But if we agree with you and reverse, then what's going to happen? Judge Dowd, I apologize, I'm not sure I heard the question. We assume we agree with you and we reverse, then what happens? Your Honor, if you reverse and remand to the agency, we would submit the instructions to the agency should be take into account all reasonable alternatives. State your real objectives plainly so people can evaluate it. Starting from scratch, in other words? I don't know that it's completely starting from scratch. But this process started in 2003, didn't it? They announced their intention in 2003, but the proper work for the EIS I think began in 2005 or 2006. But by the same token, Your Honor, even under their traffic projections, which we think are flawed, the traffic levels do not reach capacity for the existing Ambassador Bridge until 2035. That's in the record. We think it's much later than that, if ever, based on what we think the traffic projections should be. But it's not like this process has to happen immediately. There's plenty of time to get this done right. It's a multibillion dollar project that's going to impact thousands of people, maybe millions of people, and it should be done right. And here, it wasn't done right. And they eliminated from consideration the principal candidate for an alternative to what they are proposing doing. And therefore, the public was deprived of reacting to that and saying, why are you choosing a publicly financed bridge that is going to be worse for the environment, worse for Detroit, worse for community impact, when there's a private company that desperately wants to use its private money to build a twin span that would be better for the environment? What's the assurance that the private company could build the second bridge? What's the assurance that the private company, your client, could build the second bridge? Your Honor, the private company has been trying to build the second bridge we are seeking. We have one more permit approval needed to be able to do so from the Coast Guard, which we think we're legally entitled to right now. But the issue here, Your Honor, and the State Department confirmed in this record, document 124512, that we have a right. We do not need a presidential permit. We do not need congressional approval. We have a right to build that new span. And we're trying to build it. And the only thing standing in our way right now is one regulatory approval from the Coast Guard that we think we're entitled to receive. But the issue isn't, if they think there is something that prevents the bridge company from building its new span, then that's what needs to be explained. That's what NEPA requires. It needs a full airing of what the analysis is. But they're not relying on some analysis that we could never build it. They do say, the Judge Cone said, it's not in the record, but Judge Cone said, well, if Canada says they don't want it, then who are we to disagree? The FHWA has to bow to that and must abandon any consideration. But the NEPA regulations say in 1500.14 and the questions and answers that the Council of Environmental Quality put out on that requirement, which are found at 46 Fed Reg 18026 and 18027, that the alternatives, all reasonable alternatives must be considered, first of all. And second, the agency can't limit the alternatives to what they want or what they think is politically feasible. It's not a question of what's politically feasible. It's what's economically and technically feasible. Two questions, then. You've had two interesting words used there. One is all reasonable alternatives, and the other is politically feasible. I understand politically feasible in the domestic context, where you say it's not for the agency to decide whether the Senate will do something or the House will do something else. Are there any cases that say that includes international, that they should take no account of whether something can be done when other nations? And similarly, is it a reasonable alternative if a necessary foreign nation will not participate? Is there any law, or are we just going on general definition? Judge Boggs, I'm not certain there's any law, and there's none that I can say to you right now. I think we did our best to look for that in the briefs. Unless it's in the briefs, then I would conclude we didn't find it on point. But, of course, that means there's no law going the other way either. And this is a unique circumstance in the following sense. This whole project was a partnership between the FHWA, Michigan DOT, and the Ontario and Canadian Transportation Ministries. They were all in it together from the beginning. And, therefore, the applicant here really is, in sum and substance, Canada. And the regulations are very clear. And, again, I cite to this 46 Fed Reg 18026 and 18027. Well, you used the word applicant here. I mean, because NEPA, you know, isn't about having a person applying for a permit. It's a federal agency doing something. I understand, Judge Boggs. I think the reason the Council of Environmental Quality regulations use the term applicant is because it is often the case that either an agency or a private company is seeking a permit. Permit, right. And then that triggers NEPA. But it's also triggered, obviously, when the agency simply decides to build a dam or whatever. But I take the meaning of this regulation and the commentary on it from CEQ to mean that whoever is trying to do the project, whether it's a government agency or a private company that needs a permit, that triggered the NEPA review, you can't limit the alternatives to what that person wants. And they certainly can't define what they want so narrowly that it eliminates... Is there any case or even administrative proceeding that you can cite that treats a foreign government as an applicant? Your Honor, I don't think I have anything to cite to you that deals with the... that specifically on point addresses the foreign government aspect. Okay. But what we do have is case law saying, which we cite in our brief, save Cumberland Mountains from this circuit, citizens against Burlington from the D.C. circuit, the Simmons case from the Seventh Circuit, all of which say that the agency cannot... neither the agency nor the applicant can so narrowly define what they're trying to do that it excludes an analysis of a reasonable alternative. Similarly, the Obama or Abema case, not to be confused with the President's name, cited in our briefs, I think is extremely instructive because it says that even if the goal has been defined really narrowly, when you look at what a reasonable alternative is, you need to look at the general goal, not the extremely specific goal. And what I'm saying is it's now revealed, but it was never disclosed in the process, that the goal was a publicly owned bridge. And quite honestly, the goal from Canada was a publicly owned bridge to drive the privately owned bridge out of business. I can support that in a moment. But even if you accept it, even if that had been disclosed and had been explained, which would have made a huge difference to this process, even then, when looking at what the reasonable alternative is, you shouldn't limit yourself to that narrow goal, but look at the general goal, a new bridge. Okay, well, what are the alternatives? Well, the most obvious and the most reasonable alternative is you have the existing bridge that's been there 80 years, privately owned, and they have been trying for a decade to build a twin span, to upgrade their infrastructure. With respect to that building a minute ago, you had said that you had all the permits except this last one from the Coast Guard. Does that include approval from Canada? Your Honor, I would love to answer that. To be clear, this is something we sought judicial notice on in a motion that was denied. But the state of play right now with leave of the court is a draft EA has been issued by Transport Canada finding no significant environmental impact by our proposed twin span. We hope to have that finalized within the next month or two. I believe by November, I was told. And then it's one other approval that we have a dispute whether we need or not in Canada under the so-called International Bridge and Tunnel Act from the Governor and Council. And then we're approved in Canada. Okay, so the last, because obviously you need some approval that a bridge can't just appear on Canadian soil. No, no, no, we absolutely recognize that you can't build half a bridge. And so in any event, with limited time, I'd like to quickly touch on these remaining issues that we have raised in our appeal on the elimination of X-12. Document 14802 is the heart of it. That is where Mr. Steele eliminates X-12 from consideration. X-12 exactly the same as the second span? Yes, and he says that in that document. In 14802, he equates them. And he says it ranked very high on the U.S. side, but we're going to defer to Canada. He says nothing about the true reason, which is that's because Canada doesn't want a privately owned bridge and is out to basically appropriate the master bridge. He also doesn't say anything about the ex post justification the FHWA is now relying on, so-called redundancy. That document is therefore very important. Secondly, this court in Meester said you cannot eliminate an alternative based on something that it is not. In this case, the Canadian side assumed there would need to be these massive new plaza. They first said 25 acres, then they said 35 acres, then they said 80 acres, then they said 120 acres. This is noted in our briefs. That was not a correct assumption. There is already a plaza there. They never explain why they need a new plaza. They say, well, if it's government owned, we can't use your private plaza. That's not true. The plazas on both sides of the ambassador bridge are operated by customs officials from the respective governments. So it violates that principle of Meester. On the no-build alternative, Your Honours, it's a shell game and a catch-22. They acknowledge in document 69, paragraph 19, that the no-build should include the new span. Yet, when they go to consider it, they consider either the new span or the old span, but never both together. We made clear, and this is the catch-22, we, the bridge company, made clear that while we didn't think traffic would ever necessitate 10 lanes, because we think their traffic is way overstated, if it ever did, we made clear repeatedly to the agencies that we could, with minor modifications, all 10 would be open, and you'd have the full 10 lanes they seek to accomplish. My time is up. I would like to say one brief thing on traffic, or I can wait until rebuttal, Your Honours. There is one or two points on traffic not made in our brief, so I would beg leave of the court for two minutes to complete them. We certainly have two minutes. It will come from your rebuttal time. That's fair enough, because then I give counsel an opportunity to respond. On traffic, the data is undisputed that traffic levels from 1999 to 2004 were declining over the Ambassador Bridge. That's not disputed. The FHWA produced an expert report showing that for some reason in 2005 it was going to turn the corner and grow every year by 2.7% for the 30-year horizon. Fine. That's their expert methodology. We think it's wrong, but we're not here on a battle of the experts. What I wanted the panel to know is it was declining before the projection. Then, the EIS is not until the end of 2008, and guess what? In 2005, 2006, 2007, during that three-year period, the traffic continued to decline. So the arrow was pointing down, not up, declining by 3% a year, not growing by 2% a year. That is not a battle of the experts. That is a willful disregard of the actual data. We submit more egregious than what this Court reversed in the Meester case, where the snowmobile prognosis of the National Park Service was reversed because there was no data supporting it. Here, you have actual data contradicting it. And the agency knew it was vulnerable on this. I would like to cite the Court to Drick Bates No. 129-418, in which the point man for the FHWA on this project, Jim Kirstensteiner, was asked or was reporting what the most vulnerable areas were for the project, for NEPA review and in judicial review. This is in 2007. He said two things first. The purpose and need, especially the need, he acknowledged was questionable. Related to that, bullet point 2 in that document, the traffic projections. They knew they were vulnerable. At the bottom of the email, he said, I think you should delete this email. We don't want it being FOIAed. It won't be helpful. Your Honors, with that, I will rest and reserve the rest of the time for rebuttal. Thank you. Good afternoon. May it please the Court, I'm Lawrence Garcia. I'm here on behalf of the community of Del Rey. That is a minority, poor community, which will be impacted adversely by this project if allowed by this Court. The community in Del Rey was the preferred alternative. It was preferred over other communities that are not poor and that are not minority communities, and I submit that was no accident. FHWA violated NEPA in reaching the conclusion that it wished to reach, much as Mr. Hume told you about. He explained some violations, and I adopt his arguments, but I'd like to point out some other further arguments which illustrate the violations of NEPA that were committed by the defendants. Over and above what you've already heard about, Federal Highway's violations extend to its improper handling of environmental justice concerns. As explained in the community group's opening briefs at pages 21 and 22, Federal Highway's decision to include environmental justice review in its analysis exposed that analysis to review on environmental justice grounds and rules. Executive Order 12898 and Federal Highway's Order 6640.23a both instruct that the agency must identify and avoid disproportionate impacts on environmental justice populations such as those in Del Rey. By considering alternatives. The defendants failed to do that, and they failed to take the required hard look at the environmental justice considerations and the alternatives. What alternatives should have been adapted? Thank you for that question, Judge Dowd. The alternatives that do not involve Del Rey, the more affluent and whiter communities represented by options X1 through X9, So the affluent people don't have any rights, but the minority people do? No, Your Honor, no. What I'm saying is in order for the analysis to be valid under environmental justice doctrine, one has to consider an alternative that isn't founded in the bad part of town. The purpose behind EJ is not to put every big government project in the bad part of town, because if we allow that, then that part of town will be destroyed. So the alternative is to put it in the wealthy part of town? It's got to be someplace, right? That's right. And they're going to have to appropriate the land, apparently there has to be a lot of appropriation of land here, of businesses and what have you. Quite right, Your Honor. You're saying as long as they put it in Grosse Pointe or some wealthy area, be okay? Well, there were no options in Grosse Pointe, but there were some... Well, I use Grosse Pointe because I know it's a well-to-do community. Yes, Your Honor. First of all, the no-build alternative, as Mr. Hume explained, wouldn't have disrupted any communities. Then we'd have an expansion of a bridge that already existed and no one loses. But if we had to have it in a new place, that's fine, but it should be fairly selected where that place is. Counsel, isn't... I've been listening to you for three or four minutes and you've made a lot of result-oriented points. We ought to be fair, it ought to not affect these sorts of people, but isn't the whole point of NEPA, as every professor in every treatise says, it's not result-oriented, it's to understand the considerations. And so if they correctly state this one will affect 4,000 Vietnamese, this one will affect 4,000 Jews, then the decision is not... I mean, even if environmental justice were before us, the choice isn't before us, is it? No, but... All right. To state it as quickly as I can, Judge Boggs, if a community has to be sacrificed in order for this bridge to be built, and I'm not sure that it does because of the no-build alternative, but if a community has to be sacrificed, let that community be picked fairly under NEPA process. And part of that process... That's the point I'm trying to make to you. Yes, sorry, Judge. The selection has to be able to stand scrutiny under NEPA. No, it doesn't. The document, the study, has to withstand scrutiny under NEPA. The selection has nothing to do with NEPA. Isn't that right? Isn't that the law? Yes, Judge. And neither the draft environmental impact statement nor the final environmental impact statement allow us a consideration of alternatives where an environmental justice community is stood alongside another community and we see that there are some unique problems in the other community. Are you saying that they didn't say things right in the study or simply that they didn't find another place to study that would have less impact on minorities? I believe the second, Your Honor. Okay. And the point is that they have to take a hard look at these alternatives to consider a way to avoid overburdening an environmental justice community. And that was not done. The X1 through X9 were eliminated three years before the environmental justice analysis was performed. So there were no alternatives left. So even if X1 through X9 were eliminated for good and sufficient reasons, they should have been resurrected for environmental justice concerns? At least one, Your Honor, as an illustrative alternative to the idea of founding the project in the environmental justice community. Okay. And then... Oh, I beg your pardon, Judge. Chief wants you to speak. You can keep speaking. Your light is on. Good afternoon. May it please the Court. My name is Vivian Wong, and I represent the Federal Highway Administration. Before I begin, I would first like to thank the Court for postponing argument on account of my knee surgery. We really appreciate that. Appellants pick out portions of the record to paint a picture of bias. But when we evaluate the record in its totality, it's clear that the agency did not predetermine the selection of the Delray site, but instead analyzed and ultimately rejected other options, including the second span, because they would either not meet project purposes of enhancing transportation capacity and national security, because they would not be feasible, or because they would have other adverse impacts, including impacts on minority and low-income communities. NEPA ensures that agencies incorporate environmental analysis in their decision-making, and FHWA undertook a robust and thorough analysis here. And that is all that NEPA requires. Can I interrupt this for a second? I'm not sure who's going to pay for this. Is it Canada, or is it not? It seemed to me, as I read the briefs, that there didn't seem to be any agreement. There's a lot of cost involved here. Is it going to be paid by Detroit, by the Federal Highway Administration, by Canada? Who's going to pay the cost of this project? I believe it's a combination of all of the above, Your Honor. So the federal government will be putting forth federal funds, and ordinarily with federal highway projects and these sorts of bridge projects, the state provides matching funds. But in this case... What about the city? Detroit's in bankruptcy. It is, Your Honor. I don't believe that... My understanding from the record, and I would want to double-check this, is that funds for things such as land acquisition and mitigation measures and all of these things come from the state, including with matching federal funds, and also Canada has actually offered to pay for Michigan's portion of those costs. Thank you. Your Honor, I will first address Mr. Garcia's environmental justice concerns. The agency engaged in an extensive outreach to ensure that the residents of Delray were informed of and had the opportunity to comment on the project. Public workshops were held beginning in 2005. We handed out thousands of flyers door-to-door to businesses and residents informing them of public meetings, and the agency also opened a field office in Delray to provide information. The agency also distributed materials and held meetings both in English and in Spanish, and in response to the comments received, the agency modified the project to mitigate impacts to the community. Counsel, that's very nice, but if you had done none of that, would it have been attackable under the executive order or under NEPA? Not directly under the executive order, Your Honor, which, as the order itself states, does not create separately enforceable rights. However, what the executive order adds to the NEPA process sort of refines what NEPA already requires, which is consideration of impacts to the human environment. So can the executive alter the legal obligations of a congressional statute? In other words, it's almost the same question I asked your colleague. If before the executive order, NEPA is satisfied by saying this will affect 4,000 people, this will affect 4,000 people, is it then legally obliged afterwards to say these are 4,000 Vietnamese, these are 4,000 Jews? Under the executive order, the agency would be required to, as part of its analysis, look at specifically impacts to low-income and minority communities. And so as appropriate, Your Honor, that may involve looking at racial demographics and income demographics of neighborhoods in terms of evaluating the different alternatives. Required under the executive order, again, required in what sense? It means the president can fire the administrator if he doesn't do it, but does it mean that a court can look at whether the administrator did that? I believe it's the latter, Your Honor, that what it does is it refines the analysis. And so while it does not, the executive order does not create a separately enforceable right, and so it doesn't in and of itself enable the president or the court to invalidate an agency action. However, what the court's inquiry is, and as it always was under a NEPA analysis, is whether the agency took a hard look at all of these different aspects. And the executive order refines that analysis by saying, you know, you're looking at impacts to natural resources, to wildlife, toxic sites, and the human environment. And as part of the investigation into the human environment, also look at, in particular, impacts to low-income communities, impacts to communities of color. And it's, as the executive order itself states, it's instructing federal agencies to identify and address as appropriate these adverse impacts. Mr. Garcia speaks of the downriver alternatives as being improperly, alleges that they were improperly eliminated from review, but that is not the case, as the district court found and as the record demonstrates. In fact, some of these, on page 12-7-6-10 of the record, there's analysis relating to November 2005 meetings indicating that the downriver areas, including River Rouge and the Belle Isle areas of the city, were initially considered as potential sites. But the agency ultimately concluded that, among other reasons why those would not meet the purpose and need of the project, those communities actually have larger concentrations of environmental justice populations. And so it's not true that the agency didn't consider these impacts. And also, as the agency determined, there was unfortunately not really an alternative that would have no impacts to communities at all. Can you address the question that's been raised by your adversary that there was an initial decision to proceed with public ownership, even though the Detroit Bridge owned the existing bridge, privately owned the bridge, and apparently wanted to go ahead on their own to develop another bridge. So what supports the proposition initially made that public ownership would be the result? Your Honor, the record does not support Appellant's contention that public ownership was a requirement of the project. The final environmental impact statement at the record of decision, in fact, lists seven criteria for consideration that the agency applied in looking at the different alternatives. And these seven criteria were protection of community characteristics, maintaining consistency with local planning, protecting cultural resources, protecting the natural environment, improving regional mobility, maintaining air quality, and constructability. Nowhere in this criteria that the agency applied was there a requirement for public ownership. That ended up being the preferred option, and the alternative chosen is a product of reasoned agency. Your position that that's the result, but that wasn't the decision going in, the study preceded the decision of public ownership? That's correct, Your Honor. And in fact, the agency did consider four alternatives proposed by the private sector. These are detailed in our brief and also in the final EIS, but it included the second span proposed by the bridge company and also a proposal relating to the Detroit-Windsor Tunnel. What you called the second that you did consider, is this the same as X-12? It is, Your Honor. Turning to the bridge company's arguments, they assert that the second span was improperly excluded from consideration, but that, as the record demonstrates, was simply not the case. The FHWA reviewed all of the pertinent documents, including analysis provided by the Canadian agency, and determined that the analysis correctly identified significant community disruptions and environmental impacts of development of an expanded plaza and rebuilding of the connecting roadway system on the Canada side. And so that was one reason, but not the only reason, why the second span alternative was rejected. In fact, the agency also found that not only were these impacts unacceptable to Canada's perspective, and clearly building half a bridge is not a practical option, in addition to Canada's objection, the expansion of the second span would not address issues such as system redundancy and the national security concerns that the agency was looking at. I'm a little bit confused about the extent of the Canadian opposition there, because looking at the briefs, it seems at least from your side of the picture that there was opposition on a couple of fronts, environmental impact as well as environmental justice. But your adversary here says that Canada is fine with it, and they really think that all they need is just one more permit or approval if they get the Coast Guard one, and they'll be able to build the bridge right exactly to that point, and Canada will be perfectly happy. And I'm having some trouble figuring out what is the case. Yes, Your Honor. The study that counsel is referring to is actually a study that postdates by several – it was a study that was, I believe, published earlier this year, and it clearly postdates the record decision that's on review before this court. At the time the agency was making its decision and going through the draft EIS and final EIS and comment process, Canada had expressed its opposition to that second span, and so that's the record that the agency was – had in front of it at the time it made its decision. And subsequent analysis by Canada, and as we set forth in our opposition to the motion for judicial notice, the report that Canada submits actually considers a project that's different than the second span. And so that's – I believe that not only is that not part of the record, it's also not determinative of the agency's evaluation here. And to elaborate on that, Your Honor, the reason why the second span was also found to not be the preferred alternative, and this is on page 14343 of the record, it failed to satisfy project needs, including efficiency via freeway-to-freeway access and redundancy, which means the adequate – provision of adequate alternative pathways to maintain the flow of traffic in case one road segment is unavailable, and the ability of the remainder of the system to handle that additional traffic. And so because the expansion of the second span would not provide those additional connectors and place customs inspections plazas at certain locations, it was ruled out as an alternative. With respect to the Canadian position, I sort of heard what you said. I wasn't quite sure that I integrated it all. Were you indicating that there has been some change in Canada's political position since the record of decision, or were you just indicating there was some difference between what Canada rejected and what your adversary claims they're willing to accept now? Your Honor, I do not believe that Canada has necessarily changed its position. And the draft Canadian environmental assessment that counsel was referring to is just that it's a draft report of a different project. And so there's nothing in the record. And you say it's a different project because how is their draft EA different from the alternative that you rejected? Well, I will have to double-check in our opposition papers to this, but I believe that it considered a different number of spans at the bridge, and it also did not consider the need for the American side of the project in terms of whether the customs plaza would be moved or expanded or any of the connecting roads. And so those were all reasons why. Those are all part of the definition of project purposes and needs. Okay, but I did understand from your papers that the Canadian opposition to the alternative that you were considering was where and how it would go into Canada. So does this project they're now pushing go into a different place in Canada? I'm afraid I don't have the answer. Okay, that's fine. Go ahead. Use your time your way. Thank you. Thank you. Turning briefly to counsel's reference to the fact that the second span alternative was considering a sixth span versus a tenth span bridge, the agency acted in a reasonable manner when it took what was at the time the only official document that the bridge company had submitted, which was this draft environmental assessment that described the second span as a replacement bridge and noted that once it was constructed, the existing bridge would be taken out of service to perform repairs and then afterward used for things such as pedestrian and bicyclist amenities. And so that was the official document in front of the agency. And so it was entirely reasonable for the agency to rely on that characterization of what the second span would be used for and whether the existing bridge would be taken out of commercial truck use. But even if the tenth span bridge was an option, the agency actually looked at an alternative that would have involved an eight-lane twin bridge, and that was found to either overload the existing connecting road or to have unacceptable impacts if the connecting roadway were expanded. And so because of that, the agency concluded that it was confident that the ten-lane twin bridge would have similar but greater impacts and thus was rejected as an alternative. And this is on page 60993 of the record. And so in any case, whether six lanes, ten lanes, the agency properly looked at the evidence before it and determined that these were not the preferred alternatives. Your Honor, if you look at the bridge company's complaint, they discuss the poaching of revenues from the Ambassador Bridge and their briefs on appeal discuss traffic studies and public versus private bridge ownership. These are not environmental considerations. And at the end of the day, what DBIG is trying to do is to use an environmental review process to vindicate their economic interests. And that is not what NEPA was intended to do, and that is not... They do not show on the record that the agency abuses discretion in considering any of these issues, in considering the alternatives, in defining the need and purpose of the project, and in choosing its traffic methodologies. To address counsel's discussion of the traffic studies and the data, the agency acted within its realm of expertise in finding that the data provided by the bridge company would not aid in the projection of traffic trends. This is on page 5068 of the record. The agency explains how the data projections made use of earlier horizon year and did not account for truck's larger size. And in any case, even though the 2008 numbers were lower than anticipated, the 2007 data that the agency, the actual data that the agency evaluated was within the lower range of the forecast modeling that the agency had used. And so based on that, the agency reasonably concluded that there was no need to rethink the basic assumptions that underlie the modeling process. And this technical analysis is entitled to deference, and the bridge company is wrong to ask the court to substitute the company's opinion for the agency's expertise here. I gather no construction has been undertaken to this point. No, Your Honor. There's other aspects of the project that's, I believe, being litigated in state court. Your Honor is correct. I believe right now the project is in the process of acquiring the needed right-of-ways, but certainly no ground is going to be broken any time. Thank you. Procedurally, could it go forward before this court and potentially Supreme Court review of the FEIS? Yes, Your Honor, because the record of decision with respect to the NEPA process is a final decision. Okay. So once the rod was issued, you could go forward unless there were a stay of some sort or an injunction? The project itself would not be able to go forward, Your Honor, because the NEPA analysis is but one component of the necessary legal analysis and acquisition of permits and other requirements that have to be met before a project can proceed. And I think, for example, because it is a cross-border project, State Department approval is also necessary. So these are all, even though the record of decision is a final document as to the NEPA process, it is not final as in, you know, it is by no means the last hurdle before the project can proceed. And finally, to respond briefly to the bridge company's contention that the district court should have permitted supplementation of the record, the lower court promptly denied these motions. The documents that they seek to submit were not in front of the agency when it issued the record of decision for this project. And quite simply, there is a, as circuit courts have held, including this court, there is a presumption of regularity in the administrative process, and a plaintiff has to make a very, meet a high burden of, a heavy burden of making a showing of bad faith, and they simply don't do that here. Your Honors, to conclude, this is not a typical NEPA case because DBCO's arguments are not about whether the agency has considered the environmental consequences of the project, but about whether the agency has satisfied DBCO's concerns that the project may take away from their revenue source by diverting traffic from their private toll bridge. DBIC and the community groups accused the agency of bias, but that is not borne out when we look at the record as a whole. FHWA developed a robust record over the course of several years, including a notice of intent that was first published in 2003, culminating in a final EIS in 2008. This process entailed extensive public involvement and produced hundreds of thousands of pages considering project needs and feasibility, including the need for redundancy, traffic analysis, impacts on air quality, noise, wetlands and endangered species, cultural resources, as well as the indirect and cumulative effects of the proposed project. The alternatives that plaintiffs discussed were rejected because they would not fulfill project needs or because of adverse impacts, including impacts on other neighborhoods with low-income and minority communities. And indeed, one of the alternatives that counsel discusses, while the X-12 or second span alternative did rank well on some factors, it actually ranked quite low in terms of regional mobility and it ranked very low in terms of air quality and cultural impacts. And so those were reasons supported in the record why those alternatives were considered and ultimately rejected. FHWA took a hard look at the environmental impacts, including impacts to the community of Delray. The agency solicited public comment over the course of all of these years in many meetings, broadcast radio advertisements, and handed out flyers to ensure that community residents were aware of meetings and had a chance to come to attend workshops to participate in the process. In response to those comments, the agency actually modified aspects of the project to mitigate impacts to the community. The selection of the preferred alternative was the product of a reasoned process, and FHWA did not abuse its discretion in identifying the DRIC project as the preferred alternative. We respectfully request that the lower court's decision be affirmed and if Your Honors have no further questions. I think we do not. Thank you, counsel. Your Honors, thank you. I would like to begin with counsel's response to the question about the commitment to public ownership. First, I would like to note, this was our first lead argument in our opening brief, that they had improperly pre-committed to public ownership, not disclosed it, not explained it. In the FHWA's response brief, they say precisely nothing about that argument. I appreciate the court's question to counsel. Today, the answer is they didn't make such a pre-commitment. That's purely fanciful. We're making it up. So we decided that was erroneous and set it aside. So what happens next? I'm asking you to assume, for the purpose of responding, that we conclude that the failure to consider anything other than public ownership was arbitrary and capricious, so we so state. So then what happens? Then, Your Honor, you remand to the agency, to the FHWA, with instructions to be clear about what the pre-commitment and purpose is and to study the alternative of a privately-owned twin span because the NEPA regulations say even if it's outside of what you want, you have to study it if it's a reasonable alternative. And the privately-owned twin span... And in the meantime, your company can build their second bridge. Does that take place? Your Honor, they would say we're free to go forward. We are trying to go forward. And by the way, the one permit remaining is a Coast Guard navigational permit which should be ministerial. It's not coincidental they're fighting us in court over giving it to us. I'm just trying to get the clear picture. We reverse and remand, you build the second bridge. We absolutely will if we get the permit and proceed. If they think that we're not entitled... I'm assuming first we reverse and second you get the permit, you'll go ahead and build the second privately-owned bridge. There's nothing saying... The State Department said we could. I'm just trying to get a clear picture of the future here. And if Canada, if the draft EA proceeds through whatever Canada's analogy is, which I have no knowledge of at all. Correct. Exactly. I mean, there will be those issues. But at a minimum, what we're saying is if you reverse, they will present a full NEPA study of what their project looks like versus our project. Yes, we'll proceed on our project if we can get these few remaining approvals, which we think we should be entitled to receive. But I do want to address the response that there's no... Do you need any approval of Michigan or United States approvals to build the second span? The only remaining approval we need on the U.S. side of the border is a Coast Guard navigational permit for a bridge that is identical to the existing one, in fact, has less navigational obstruction. So it should be a no-brainer. Okay. Thank you. Your Honours, it is true that if you read the purpose and need of the DEIS and the FEIS, it says nothing about a pre-commitment to public ownership. It is true that if you read the seven criteria, it doesn't. That's what we're complaining about. It wasn't transparent. But they do admit it at the end of the process, when it's too late, and they don't explain how important it was to the process. DRIC number 14326, in a section called Governance, in the final environmental statement, it says the partnership is, quote, committed that the new crossing will be, quote, publicly owned. In a Q&A at DRIC 15832, it says the partnership is committed to public ownership for the new crossing. What it doesn't say is when was that commitment made and what influence did it have on the process. So those pages aren't an admission, as you just stated. Where is the admission? The admission, Your Honour, is in 2004. Four documents, two in the record, two not in the record. Let's stick to the two in the record. The two in the record, well, I want to come back to the other. The two in the record are DRIC 106789 and DRIC sup 005468. Give me that number again, the second one. The second one is DRIC sup, because it's a supplement to the record, 005468. In that document, you will see an MDOT employee responding to the Canadian guiding principle that they had articulated of choice and market competition, saying this seems, quote, clearly aimed at the Ambassador Bridge. And she says initially they resisted. Quote, in the current federal environment, private sector participation in the transportation system is not necessarily a bad thing. Why don't we let the NEPA process run through this, she says. In the district court, we asked the court to include in the record two emails that were from the same people who are emailing in these two, Andrew Shea from Transport Canada, who was their point man on this partnership with MDOT and FHWA. He sent an email right before those two in October, in which he forwarded the proposed governance system and was told by his colleague, I think, superior, that, quote, the real option is to buy the interests of both crosses. I'm sorry, the colleague superior at that point is a Canadian? Canadian. Okay, so who's the Michigan lady that you referred to? Andrew Shea. I understood, but earlier you said there was a Michigan woman. There is a Michigan lady whose name I don't have, but she would be on the DRIC sub. Okay, but it doesn't sound like she's the big boss if you don't even remember her name. She may not have been, but the big boss said the real option is to buy the interests of both. But you just said the big boss, that's on the Canadian side. Yes, but they were telling their partners in this DRIC partnership what the governing principle should be, and to the earlier question, Canada is paying for this project. They were driving it, and they say, quote, we might be in a much stronger position to negotiate a reasonable price, that means for the existing Ambassador Bridge, if, quote, the new crossing is operational and captures a substantial share of the market, end quote. Then they say to their Michigan partners and FHW partners, we should have a guiding principle of choice and market competition. They all know what that means. They say, you may know the Ambassador Bridge owners don't get to build their twin stand. We're going to eliminate that. And they say in an admission in document 37-3 in the District Court record, docket number 37, Exhibit 3, the MDOT employee is quoted as saying in an email that Canada writes, but quoting MDOT, they have, quote, grave concern with the governance principle. Quote, the principle implicitly precludes the Ambassador Bridge. Just let me make sure what you're reading from. This is an exhibit in the District Court record, 37-3, which is a document written by a Canadian, Mr. Shea again? Mr. Shea again from Transport Canada, who was one of the DRIC partners in this project. And that is in the District Court record, but is not in the ROD or the FEIS? Not in the administrative record, but it was in the District Court record. But we can read it in the District Court record. Absolutely. Doc 37-3, and by the way, the other I read from about driving down the price is 37-2, both of which are documents the Bridge Company tried to get put in the record, which Judge Cohn denied. So he says she – Wait a minute, wait a minute. You said you tried to get them put in the record? The administrative record. Okay, but can Judge Cohn alter the administrative record? Yes. With good cause, he can expand and show. If there's reason to believe there's more background needed to evaluate the agency's decision. Was this before or after he ruled? Before. Or actually, I think, simultaneous. We asked – we had cross motions. But he had a separate decision denying this. In any event, if I may just finish the thought that my time is up, but if the Court will permit, Andrew Shea says in this document 37-3, this principle implicitly precludes the Ambassador Bridge from owning slash operating a new or expanded international crossing. This principle would effectively eliminate the twinning of the Ambassador Bridge from the environmental assessment process. End quote. He then says his colleagues at MDOT, quote, This action, in their words, he writes, quote, fatally flaws the EA process. They admitted it from the beginning. This insistence from Canada that the privately owned twin spend not be considered would fatally flaw the process. The rest of that email chain is, Your Honors, I submit, worth reading. It shows the back and forth, the desire to be more explicit, and the higher ups say, don't be more explicit, but stick with the principle. To the questions from Judge Boggs about the process of NEPA, what's happening in Canada? I would simply submit this point. Politics change. Public opinion changes. The purpose of NEPA is to disclose the information transparently to allow better decisions to be made. 1500 point, I think, 1C of the NEPA regulation says the purpose of NEPA is not paperwork, even excellent paperwork, it's better decisions. Judge Boggs, of course, is correct. It doesn't ever dictate a result. You don't get to seek a new result, but you do get to fight for a fair process that discloses all the information, the purpose of which is to get a better decision. Your Honor, if you have more further questions, otherwise I'll. I do not. Thank you, Your Honors. Is there rebuttal from the other appellants? I don't recall if you had reserved any. I didn't reserve any time, Your Honor. Thank you. Thank you. There being nothing further, you may adjourn the court.